**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| ALICE WRIGHT,<br><br>   Plaintiff,<br><br>v.<br><br>DST SYSTEMS, INC.,<br><br>   Defendant. | Case No.: 4:21-00064-MC-W-HFS |

**PLAINTIFF'S REPLY IN SUPPORT OF
<u>PLAINTIFF'S MOTION TO CONFIRM ARBITRATION AWARD</u>**

Plaintiff Alice Wright respectfully submits this reply in support of Plaintiff's motion to confirm her arbitration award (the "Motion") and in opposition to DST Systems, Inc.'s ("DST") motion to dismiss (the "MTD").

## **INTRODUCTION**

In 2008, DST implemented an expansive "Arbitration Program and Agreement" (the "Arbitration Program and Agreement" or "Arbitration Agreement") requiring that employment-related disputes be resolved by individual arbitrations conducted by the AAA. In a memo announcing this change, DST advised its employees that the Arbitration Program and Agreement "demonstrate[s] our commitment to resolve problems in a fair and equitable way." DST assured its employees that if a dispute arose under the Arbitration Agreement, "the dispute will be resolved through a fair, fast, simple process before an expert arbitrator, rather than through a long, complicated and expensive lawsuit." In talking points intended to convince its employees to agree to arbitration, DST insisted that "the advantages of Arbitration" are that it "solves problems faster," is "less adversarial," and is "more efficient."

DST's assurances to its employees could not be further from the truth. Rather than commit itself to a fair and equitable resolution of arbitration claims, DST has, in the words of one local arbitrator, taken "varying and inconsistent positions to *prevent* Claimant and other Plan participants *from ever seeing a hearing*." *See Payne v. DST Systems, Inc.,* AAA 01-18-0003-0418, Final Award, at 13, attached as **Exhibit A** (emphasis added). Now, having failed in those efforts, DST has decided that it will *anything* to prevent Ms. Wright and other arbitration claimants from *ever* recovering their lost retirement savings through arbitration. *That* is the sole purpose for DST's motion to dismiss.

1

We know this because there is absolutely *nothing* to appeal. Ms. Wright joins more than 90% of those have *won* in arbitration against DST in near identical cases. Meanwhile, since the parties requested and *stipulated* to a simple award, Arbitrator Freedman's decision offers no rationale for his award. Inasmuch as anything can be gleaned, it is obvious that Arbitrator Freedman agrees with more than 80 other arbitrators who have concluded that DST violated the law of ERISA, entitling Plaintiff to damages and attorneys' fees. In awarding fees, it may be gleaned that Arbitrator Freedman properly followed the established rule that, where an ERISA beneficiary is entitled to attorney's fees, the amount of the fees may be calculated on an hourly, or "lodestar," basis. *Tussey v. ABB Inc.,* No. 2:06-CV-04305-NKL, 2015 WL 8485265, at *2 (W.D. Mo. Dec. 9, 2015); *McElwaine v. US West, Inc.*, 176 F.3d 1167, 1173 (9th Cir. 1999). Here, again, Arbitrator Freedman joins dozens of other arbitrations who have reached the *exact same* conclusion.

Thus, placed in its proper context, DST's desire to further prolong Ms. Wright's completed and final arbitration is nothing more than a vindictive and odious effort to forestall the inevitable. The arbitration claimants, including Ms. Wright, have *won*. While Ms. Wright may be the first to the finish line, hundreds more will follow. Each will be entitled to an order confirming their award. Therefore, since DST offers no valid reason for denying the Motion to Confirm, Plaintiff respectfully requests an Order confirming Arbitrator Freedman's signed written decision.

## **BACKGROUND**

This case centers on a loss of more than $365 million because of an imprudent and non-diversified investment in Valeant International Pharmaceuticals, Inc. ("Valeant") (n/k/a Bausch Health Companies). The law of ERISA required that DST act *exclusively* for the benefit of the Plaintiff, that it invest Plaintiff's retirement savings *prudently* and *cautiously*, and that it *diversify*

those savings so as to minimize the risk of large loss. These duties are the "highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 602 (8th Cir. 2009).

However, rather than invest prudently, DST caused the investment of more than 45% of Ms. Wright's managed retirement assets in the stock of a *single* pharmaceutical that was burdened with debt and known to mislead investors with its questionable accounting and deceptive reporting practices. Rather than diversify Ms. Wright's retirement assets, DST *concentrated* them. Not surprisingly, when ongoing investigations began to reveal that Valeant was little more than a "Pharmaceutical Enron," its stock price plummeted from $258 per share to $26 per share. Meanwhile, DST *did nothing* to safeguard Ms. Wright's retirement assets. As a result, a significant portion of her retirement savings, as well retirement savings of thousands of other DST employees, went up in smoke.

On January 1, 2017, an employee of DST and a participant in the Plan filed a class action against DST alleging that it had violated the law of ERISA. *DuCharme v. DST Systems, Inc.*, 4:17-cv-00022-BCW (W.D.Mo.). On February 22, 2017, DST filed a Motion to Compel Arbitration and to Dismiss. (*DuCharme*, ECF No. 27.) On June 23, 2017, this Court issued an order dismissing DuCharme's class action complaint, finding that "the Arbitration Agreement at issue is valid and Ducharme's claims for breach of fiduciary duty fall within the Arbitration Agreement's scope." (*DuCharme*, ECF No. 57.) Thereafter, DST notified all Plan participants of the allegations made in by DuCharme and advised them of the right to initiate their own "individual" arbitration proceedings. (*See* "Notice of Right to Assert Claim," attached at **Exhibit B**.)

To date, 490 individual Plan participants have initiated individual arbitration proceedings. As of today, the Arbitration Claimants have won **81** arbitration cases to be decided on the merits after trial or dispositive motion practice. Nearly 200 Arbitration Claimants have completed their

arbitration hearings and more than 100 are awaiting their awards. So far, the Arbitration Claimants have lost in only 10 cases (four of which involved the same two arbitrators).[1] Because of the Arbitration Claimants' overwhelming success, DST has engaged in innumerable bad faith and deceitful shenanigans. For example, after convincing Judge Wimes that Plan participants *must* bring their ERISA claims *on their own behalf*, DST took the contrary view and asserted in Southern District of New York that ERISA claims must be resolved through a single, *mandatory* class action. DST's attempted whipsaw represents the height of procedural gamesmanship and forum shopping and reveals the lengths to which DST will go to avoid repaying the sum of losses that it caused *its own employees*.

DST's chicanery knows no end. On August 7, 2020, DST entered into a settlement agreement with 15 Plan participants who had filed individual claims in arbitration to recover the losses caused to their individual accounts, just as they were compelled by this Court. However, when the settlement proceeds were transmitted to Fidelity Investments, the Plan Trustee, DST directed Fidelity not to deposit the settlement funds into the claimants' individual accounts. Instead, DST asserted that the settlement proceeds should be distributed across the entire Plan, to more than 9,000 individuals. Dechert LLP ("Dechert") was hired by the Advisory Committee of the DST Profit Sharing Plan to resolve whether DST's litigation position was legally justified. After "extensive research and consultation with ERISA experts," Dechert concluded that it was *not*.

Even still, in *Ferguson v. Ruane Cunniff & Goldfarb, Inc., et al.*, No. 1:17-cv-6685-ALC (S.D.N.Y.), counsel for DST is presently arguing that Plan participants "have no individual interests in their claims at all" (*see Ferguson*, ECF No. 185 at 6), while failing to disclose that

---

[1] Obviously, the heavily lopsided outcomes strongly imply that, in those 10 cases, the arbitrators made a mistake.

DST's *independent ERISA counsel* has concluded the opposite. Indeed, The Plan, itself, expressly states that "any and all claims arising out of or related to the Plan…***are subject to mandatory arbitration <u>and class action waiver</u>*** as provided under" the DST Arbitration Policy. (*DuCharme*, ECF No. 39-2 at ¶ 9.11.) According to DST (as least when it was before Judge Wimes), the Plan's adoption of the Arbitration Agreement "incorporates the terms of DST's Arbitration Agreement ***into the Plan***, and thereby ***explicitly binds the Plan to the terms of that Agreement***." (*DuCharme*, ECF No. 47 at 2.) "[I]t is an expression," according to DST (when it was before Judge Wime), "of ***intent by the Plan to be bound by the Arbitration Agreement***, just as Mr. Ducharme is bound by it." (*Id.*) DST continued: "neither the Arbitration Agreement nor the Amendment prohibits Mr. Ducharme or any other party to the Arbitration Agreement from arbitrating a breach of fiduciary duty claim in connection with purported losses to their individual accounts." (*Id*.)

Now, before a different Judge in New York, when faced with actually having to honor its side of the Arbitration Agreement that *it compelled*, DST asserts *the opposite* in an effort to force all Plan participants into a collusive settlement that the Department of Labor opposes since, among other reasons, the "the mismanagement of investments of the DST Systems, Inc. 401(k) Profit Sharing Plan ("Plan"), caus[ed] major losses to the Plan that *far exceed* the proposed settlement amounts." *See Ferguson*, ECF No. 269 at 2 (attached at **Exhibit C**.)

Meanwhile, in the arbitrations, DST has promised to appeal nearly every award, regardless of the merits of its doomed positions. DST makes no secret that its strategy is to force Claimants' counsel to spend an overwhelming about of time and money of each individual case so that, even if a Claimant wins, it comes at a significant cost to Claimant's attorneys (and to DST's own financial position). DST's strategy is a war of attrition. It has hired the largest law firms and will spare no amount of money in its effort to drag Arbitration Claimants' counsel through a gauntlet

5

of procedural hurdles in an apparent attempt to prove that arbitration is *not* a faster, less adversarial, or equitable way to resolve claims against an exploitative and vengeful employer.

In this case, however, DST *failed* to timely file a notice of appeal. And regardless of its irksome and wasteful strategy, the Arbitration Claimants *are winning*. Accordingly, at the conclusion of her arbitration proceeding, Ms. Wright filed her Motion to Confirm the Award in accordance with 9 U.S.C. §§6 and 9. Ms. Wright, like more than 80 others, *won* in arbitration against DST. Now, the Court must ensure that arbitration is fundamentally fair and put an end to DST's vindictive and wasteful belligerence.

## ARGUMENT

**I.     The Arbitration Award and Decision Issued by Arbitrator Freedman on November 24, 2020 is Final and Enforceable**

The Federal Arbitration Act "reflects the fundamental principle that arbitration is a matter of contract." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010). "The FAA thereby places arbitration agreements on an equal footing with other contracts and requires courts to enforce them according to their terms." *Id.* (Internal citations omitted.) "The 'principal purpose' of the FAA is to 'ensur[e] that private arbitration agreements are enforced according to their terms.' " *Id.* (second alteration in original) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs.*, 489 U.S. 468, 478 (1989).). Thus, courts are tasked with giving " 'effect to the contractual rights and expectation of the parties' " by adhering to the maxim that, " 'as with any other contract, the parties' intentions control.' " *Stolt-Nielsen*, 559 U.S. at 682 (quoting *Volt*, 489 U.S. at 479; *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)). *See also Houston v. NPC Int'l, Inc.*, No. 13-01160-CV-W-GAF, 2014 WL 12779236, at *4 (W.D. Mo. Mar. 24, 2014)

In this case, the Arbitration Agreement states, in relevant part:

> **The *Arbitrator* shall issue a signed written award and *decision*** stating the findings of material facts and conclusions of law that provide the basis for the decision…
>
> **The *Arbitration decision* shall be binding on DST** and the Associate; however, DST or the Associate may within 30 days after the decision file a reconsideration motion or other motion with the Arbitrator, who retains jurisdiction to consider and rule on any such motion. Additionally, DST or the Associate may serve written notice of an Arbitration Appeal: (1) **within 60 days after the *Arbitration decision*** if no reconsideration or other motion is filed within 30 days after the Arbitration decision; or (2) if a reconsideration or other motion is filed within 30 days after the Arbitration decision, then within 30 days after a decision by the arbitrator on the reconsideration motion or other motion.

Arbitration Agreement (Dkt. No. 1-1), at 2 (Emphases added).

As the emphases above make clear, the Arbitration Agreement makes very plain that "the *Arbitrator*"—not the AAA—issues the Arbitration decision. The decision is then final unless appealed within 60 days *of the decision*. Thus, for purposes of determining the date by which to serve a written notice of appeal, the only relevant date is that on which *the Arbitrator* issued his or her signed written award and decision.

In this case, there is no disputing that Arbitrator David G. Freedman issued his "signed written award and decision" on November 24, 2020.[2] As shown below, the decision is clearly signed by Arbitrator Freedman and plainly dated "November 24, 2020." (*Id.*)

Date: November 24, 2020

David G. Freedman
Arbitrator

(Dkt. No. 1-3 at 2.)

Accordingly, the deadline for filing a notice of appeal was January 23, 2021. However, by its own admission, DST filed its notice of appeal on January 29, 2021, six days *after* the deadline.

---

[2] The parties stipulated to a "simple" rather than a "reasoned" award.

(MTD at 2.) Thus, since the notice of appeal was not filed on or before January 23, 2021, the Arbitration award and decision is *final* and must be confirmed.

Still, despite the plain language of the parties' Arbitration Agreement, DST asserts in its Preliminary Statement that "[t]he AAA *issued* the award by email on December 2, 2020." But this that is completely inconsequential. The parties' Arbitration Agreement explicitly requires that *the Arbitrator*, not the AAA, issue the "signed written award and decision." The AAA simply *transmitted* Arbitrator Freedman's signed written award and decision (and did so with more than 50 days remaining during which DST could file a notice of appeal). In other words, for purposes of determining the deadline by which to file a notice of appeal, the AAA's email transmitting the award is irrelevant.

Still, grasping at straws, DST asserts that the AAA's "default appellate rules" require only that notice of an appeal be filed "from the date the Underlying Award is submitted to the parties." (MTD at 8.) Indeed, the AAA's *optional* appellate rules state that a party may initiate an appeal by filing a notice of appeal with the AAA "within thirty (30) days from the date the Underlying Award is *submitted to the parties.*" But this is of no help to DST since the parties explicitly **rewrote** the AAA's filing requirements. Thus, whereas the AAA *optional* appellate rules speak of the "submission" of an award to the parties, the Arbitration Agreement speaks only of the "***issu[ance]***" of an Arbitration decision and states that a party must initiate an appeal within 60 days after the *Arbitration decision*." (Dkt. No. 1-1 at 2.)

However, by reference to the AAA's optional appellate rules, the Court can be sure that had the parties intended that the appeal period start on the date that the Arbitration decision was "submitted to the parties," they certainly knew how include that in their Agreement. They could simply adopt the optional appellate rule wholesale or copy and paste the referenced language into

8

their agreement. ***But they did not.*** Thus, DST's reliance on the AAA's optional appellate rules *defeats* rather than support its untenable position.

DST's reliance on the Federal Rules of Appellate Procedure is similarly misguided. Rule 4 states that a notice of appeal must be filed "within 30 days after the *entry* of the judgement or order appealed from." Fed. R. App. P. 4(a)(1)(A) (emphasis added). The Rule defines "entry of the judgment" as the date on which the "judgement or order is *entered* in the civil docket." Fed. R. App. P. 4(a)(7)(A)(i) (emphasis added). This, of course, once again proves that if the parties intended that the appeal period start on the date that the Arbitration decision was "delivered by email," they certainly knew how include that in their Agreement—they could simply copy and paste form Rule 4. ***But they did not.*** The words "entry" or "enter" do not appear *anywhere* in their Agreement, nor do the words "submitted," "by email," "delivered," "sent," etc... Instead, the parties agreed that an Arbitrator "shall *issue*" a signed written award and decision, after which a notice of appeal must be filed within 60 days.

Once more, the signed written award and decision in this case was *issued* by Arbitrator Freedman on ***November 24, 2020***. Therefore, DST had until January 23, 2021 to file its notice of appeal. Since DST did ***not*** file a timely notice of appeal, Arbitrator Freedman's award is ***final*** and the AAA no longer retains jurisdiction over the matter.

## II. There was a "Complete Arbitration"

DST asserts that the Court lacks jurisdiction confirm the Award because, according to DST, there was not a "complete arbitration." (MTD at 5.) DST is mistaken.

First, for there to be a "complete arbitration," the award must indicate that is it final (not an interim award) and must indicate that the arbitrator "intended the award to be final." *Wootten v. Fisher Investments, Inc.*, 688 F.3d 487, 491 (8th Cir. 2012). This is to prevent parties in arbitration from appealing provisional or interim awards. In this case, there is no question that

Arbitrator Freedman intended that, at the completion of the appeal process (or, on January 23, 2021 if no appeal is timely filed), the award be "final."

In his signed written award and decision, issued on November 24, 2020, Arbitrator Freedman stated that "[t]his Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied." (Dkt. 1-3 at 2.) Accordingly, there is no disputing that the signed written award and decision is a final and complete determination of the parties' dispute. *See Pittsburgh Metro Area Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 938 F. Supp. 2d 555, 559 (W.D. Pa. 2013) (citing *Union Switch & Signal Div. Am. Standard Inc. v. United Elec., Radio & Mach. Workers of Am., Local 610*, 900 F.2d 608, 613 (3d Cir. 1990)).

### III. The Court Must Decide Whether Plaintiff is Entitled to

DST asserts that whether its notice of appeal was timely filed is a matter that should be resolved by an arbitrator. But, in support of its assertion, DST cites only to a bevy of cases that stand for the unremarkable proposition that arbitrators, rather than courts, should decide procedural questions having to do with whether conditions ***precedent*** to arbitration have been fulfilled. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 82, 123 S. Ct. 588, 591, 154 L. Ed. 2d 491 (2002) (arbitrators should resolve whether a condition precedent has been fulfilled); *United SteelWorkers of Am., AFL-CIO-CLC v. Saint Gobain Ceramics & Plastics, Inc.*, 505 F.3d 417, 421 (6th Cir. 2007) (same); *Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Ironworkers, Shopman's Local 493 v. EFCO Corp. & Const. Prod.*, 359 F.3d 954, 956 (8th Cir. 2004) (same).

The issue here is not whether the parties have fulfilled the conditions *precedent* to arbitration. They clearly have. Rather, the issue here is whether DST can deny Alice Wright the relief afforded her in Section 9 of the Federal Arbitration Act and require that she resubmit her claims to arbitration *ad infinitum.*

Indeed, if the Court were to accept DST's position, and dismiss the Petition, DST could simply file repeated appeals, one after another, and thereby prevent Ms. Wright form *ever* obtaining confirmation of her award. Every time Ms. Wright sought confirmation, DST could simply posit that a *new* appellate arbitrator must first decide whether its interpretation of the Arbitration Agreement, no matter how amiss, is right. DST could repeatedly and endlessly assert the right to an *additional* appeal and, in reliance on a dismissal here, state that the issue must first be resolved by a newly appointed arbitrator, thereby preventing Ms. Wright from *ever* recovering her lost retirement savings.

In fact, the prospect that DST will file frivolous and endless appeals is not far-fetched, it is a certainty. DST has repeatedly promised to continue its war of attrition. Therefore, the Court must *enforce* the parties' agreement and confirm Arbitrator Freedman's signed written award and decision.

## **CONCLUSION**

For the foregoing reasons, Plaintiff Alice Wright moves for an Order (1) confirming the Arbitration Award and (2) entering judgment in her favor in the amount of $111,347.58, together with post-judgment interest and attorneys' fees.

Respectfully submitted,

THE KLAMANN LAW FIRM

BY: /s/ *Andrew Schermerhorn*
John M. Klamann  MO 29335
Andrew Schermerhorn  MO 62101
4435 Main Street, Suite 150
Kansas City, MO 64111
Telephone: (816) 421-2626
Facsimile:  (816) 421-8686
jklamann@klamannlaw.com
ajs@klamannlaw.com

KAPKE & WILLERTH
Ted Kapke MO 52114
Mike Fleming MO 53970
3304 N.E. Ralph Powell Road
Lee's Summit, MO 64064
Telephone: (816) 461-3800
Facsimile: (816) 254-8014
ted@kapkewillerth.com
mike@kapkewillerth.com

WHITE, GRAHAM, BUCKLEY & CARR
William Carr   MO 40091
Bryan T. White MO 58805
19049 East Valley View Parkway
Independence, Missouri 64055
(816) 373-9080 Fax: (816) 373-9319
bwhite@wagblaw.com

HUMPHREY, FARRINGTON & McCLAIN
Kenneth B. McClain   MO 32430
221 West Lexington, Suite 400,
P.O. Box 900
Independence, Missouri 64051
Telephone: (816) 836-5050
Facsimile: (816) 836-8966
kbm@hfmlegal.com

**Certificate of Service**

I hereby certify that on March 2, 2021, a copy of the above and foregoing was filed with ECF with service to be accomplished electronically thereby on counsel of record for defendant.

s/ Andrew Schermerhorn
**Attorney for Plaintiff**